UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANDREA ANN AYOTTE,

        Plaintiff,                          Case No. 2:14-cv-176

v.                                            HON. ROBERT HOLMES BELL

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

In June 2011, plaintiff Andrea Ann Ayotte filed an application for disability and disability insurance benefits. See Transcript of Administrative Hearing at pages 160-168 (hereinafter Tr. at \_\_\_). Plaintiff alleges that she became disabled on November 1, 1992. Due to a previous decision, plaintiff's onset date for disability was changed to December 24, 2004. Plaintiff's application was denied initially and plaintiff requested an administrative hearing before an Administrative Law Judge (ALJ). Tr. at 102-104. ALJ Brent C. Bedwell held a hearing on March 6, 2013. Plaintiff appeared without counsel. Plaintiff was given time to find counsel, but indicated that she could not find representation. Testifying at the hearing was plaintiff, family friend Sherry Brugman, and vocational expert Adolph W. Cwik. The ALJ found that plaintiff could perform jobs that existed in significant numbers in the national economy given plaintiff's residual functional capacity (RFC) and therefore concluded that plaintiff did not have a "disability" under the Social Security Act (20 C.F.R. § 404.1520(g)). Tr. at 14-26. The ALJ's decision became the agency's final

decision when the Appeals Council denied plaintiff's request for review. Plaintiff now seeks judicial review of the agency's final decision denying her request for disability benefits.

Plaintiff was born on November 6, 1982. Tr. at 38. Plaintiff took special education classes in high school and resided with her mother at the time of the hearing . *Id.* Previously, she had lived with her boyfriend for eight months. *Id.* Plaintiff had no income and received food stamps. Tr. at 39. Plaintiff worked as a kitchen helper between 2001 and 2002, where she peeled potatoes and did the dishes. *Id*. Between 2003 and 2007, plaintiff worked as a bus aide. Tr. at 40. Most recently, plaintiff worked as a babysitter. *Id*. Plaintiff has filled out applications for employment at businesses such as McDonald's and other fast food restaurants, but usually does not get call backs. Tr. at 40-41. Plaintiff testified that she has difficulty working because she lacks concentration and gets frustrated. Tr. at 41. Plaintiff suffers from migraines once a month. *Id*. Plaintiff has taken migraine pills, anti-depressants, Ritalin, and blood pressure medicine. Tr. at 42.

Plaintiff testified that she was 5'6" and probably about 260 pounds. *Id*. Plaintiff indicated that she could prepare her own meals and do light household chores such as washing dishes, vacuuming and sweeping. *Id*. Plaintiff could go shopping, watch television, listen to the radio or go for a bike ride with a neighbor. *Id*. Plaintiff has no problems with sitting, but will get sore after standing on her feet for about twenty minutes. Tr. at 43. Plaintiff indicated that she can lift a box of cat litter which she believes weighs about ten pounds, or she can lift a gallon of juice. Tr. at 43-44. When asked if she would accept a babysitting job if offered, plaintiff indicated "[p]robably, but I wouldn't be up to par as much as I used to. I don't know, my attitude wouldn't be the best." Tr. at 44.

Sherry Brugman testified that she was a friend of plaintiff's family for the past forty years. Tr. at 45. She had hired plaintiff out of compassion to do work at her house and a friend's

house, including some dog sitting. *Id*. Ms. Brugman testified that plaintiff's issues began when she was three years old after she suffered a stroke. Tr. at 46. After that time, plaintiff has had trouble with her memory and struggled through special education classes. *Id*.

Vocational expert Swick testified for a hypothetical individual who could perform light unskilled work, who cannot climb ladders, ropes or scaffolds, who must avoid irritants like fumes, odors, dust and gasses, who must avoid exposure to unprotected heights, hazards and moving machinery, and who is limited to low stress, occasional decision making and can be off task for five percent of the time, there exists 1,898 electrical accessories assembly positions in the Michigan economy and 42,093 positions in the United States economy; there exists 2,031 housekeeping cleaning jobs in the Michigan economy and 77,547 positions in the United States economy; and there exists 1,249 inspector/ hand packer positions in the Michigan economy and 48,680 positions in the United States economy. Tr. at 55. These jobs could also be performed if that same individual could not perform fast paced production work. *Id*. The vocational expert testified that if the individual needed the same tasks explained to them every day and then once a day needed a reminder of the tasks, that person would not be employable in competitive job possibilities. Tr. at 56. Similarly, the vocational expert testified that if the individual was off task more than five percent per day, that individual would not be employable. *Id*.

The findings of the ALJ are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y, Human and Health Serv.*, 945 F.2d 1365, 1369 (6th Cir. 1991). The ALJ's decision cannot be overturned if sufficient evidence supports the decision regardless of whether evidence also supports a contradictory conclusion. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003).

This Court must affirm the ALJ's findings if sufficient evidence supports the decision even if evidence supports an alternative conclusion.

The ALJ must employ a five-step sequential analysis to determine if plaintiff is under a disability as defined by the Social Security Act. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). If the ALJ determines plaintiff is or is not disabled under a step, the analysis ceases and Plaintiff is declared as such. 20 C.F.R § 404.1520(a). The ALJ found that plaintiff had severe impairments of depression, anxiety, attention deficit hyperactivity disorder (ADHD), borderline intellectual functioning, obesity, headaches, history of seizures and asthma. Tr. at 17. The ALJ determined that plaintiff had the residual functional capacity to perform unskilled light work, limited to low stress jobs, that allowed plaintiff to be off task five percent of the day, avoid exposure to fumes, odors, dust, gases, heights, hazards, and moving machinery. Tr. at 20. The position could not require climbing ladders, ropes and scaffolds, and could not be fast paced production work. *Id*.

Plaintiff argues that the ALJ erred in rejecting her IQ score of 69 and failing to find that she met Medical Listing 12.05C. The ALJ noted that plaintiff had "verbal and performance subtest scores ranging between 70 and 80 and a full scale IQ score of 69." Tr. at 19. The ALJ considered that plaintiff had received special education and that the consultative psychological examiner found plaintiff to have difficultly remembering past events. *Id*. In rejecting the IQ test results the ALJ stated:

> However, as described below, the claimant's IQ test are of questionable validity as they are inconsistent with her adaptive functioning and her diagnosis with a learning disability is not substantiated by any objective test measure. Further, upon examination, the claimant's treating physician has observed her capable of following simple commands and her speech to be fluent and intact to conversation. The consultative psychological examiner also observed that while the claimant was not a good historian, she was logical and relevant. Furthermore, the record demonstrates that the

4

claimant is able to engage in activities necessitating some ability to sustain focus, remember, see a task through to completion, comprehend and track instructions. Such activities include preparing simple foods, doing light chores, managing her money, and using public transportation. Notably, as previously explained, she maintained part-time jobs for a long periods of time, including work as a bus aide and work as a babysitter.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The claimant has not required inpatient or other highly structured treatment for her mental health conditions.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of the extended duration, the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria of 12.04 are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not reflect medically documented history of a chronic affective or anxiety disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following: repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The limitations identified in the "paragraph B" ("paragraph D" criterial of listing 12.05) criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the

>undersigned has found in the "paragraph B" mental function analysis.
>
>Turning back to listing 12.05, the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functions is precluded. In this case, these requirements are not met because the medical records show the claimant capable of following simple commands and completing a standardized intelligence test.
>
>As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less. As explained below, the claimant's IQ scores exceed the indicated ceiling and, given the claimants's adaptive functioning and abilities, are invalid.
>
>Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. As indicated above, the claimant did have a full-scale score of 69. However, the undersigned finds this score does not reflect a valid assessment of the claimant. This score does not reflect the claimant's true cognitive functioning based on the other evidence of her adaptive functioning and abilities to manage daily, social and part-time work activities. The claimant remains capable of following simple directives, socializing with others, doing light household chores, use public transportation and take care of a pet. Again, the claimant also has held down part-time jobs for significant periods. For example, she worked part-time as a bus aide from 2003 through 2007 and someone trusted her to care for young children (Hearing Testimony).

Tr. at 19-20 (citations to the record omitted).

To meet Listing 12.05(C), plaintiff was required to establish that she was mentally impaired and had a significantly subaverage general intellectual functioning with deficits in adaptive behavior manifested before age 22. *See* 20 CFR, Pt. 404, Subpart P, App. 1, Section 12.05; *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001). Plaintiff was also required to establish a verbal

6

performance or full scale IQ of 60 to 70 and a physical or mental impairment imposing an additional and significant work related limitation of functions. Id.

In the opinion of the undersigned, the Sixth Circuit's decisions in *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), and *Burrell v. Commissioner of Social Security*, 238 F.3d 419 (6th Cir. 2000), (unpublished), are instructive. In *Foster*, the Court explained:

> Substantial evidence exists to support the ALJ's conclusion that Foster does not meet the listing for mental retardation. First, the evidence does not demonstrate or support onset of the "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22. Foster has failed to show that her general intellectual functioning was "significantly subaverage" prior to that age. None of her testing or evaluation was contemporaneous with her developmental period; she was already 42 years of age when the first testing was performed in 1997. The only evidence in the record pertaining to this issue is that Foster left school after completing the ninth grade, but why Foster did not continue her studies is unclear.
>
> Moreover, the evidence does not demonstrate or support onset of "deficits in adaptive functioning" before age 22. *Burrell v. Comm'r of Social Security*, No. 99-4070, 2000 WL 1827799, at *2 (6th Cir. Dec.8, 2000) (unpublished table decision) (per curiam) ("[R]eceiving benefits under Listing 12.05 also requires a deficit in adaptive functioning.") (internal quotation marks omitted). Foster's work as an accounting clerk at a bank and a liquor store clerk prior to injuring her leg demonstrate that she had the ability to perform relatively complicated tasks prior to the injury to her leg in 1992.

279 F.3d at 354-355.

In *Burrell*, the Court explained:

> We have recognized that Listing 12.05 tracks the *Diagnostic & Statistical Manual of Mental Disorders*, one of the leading texts in medicine. *See Brown v. Secretary of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir.1991). Listing 12.05 thus reasonably interprets the Social Security Act. *See id.; see also Abbott v. Sullivan*, 905 F.2d 918 (6th Cir.1990). Furthermore, we believe the administrative law judge's opinion on Listing 12.05's application to Burrell is supported by substantial evidence in the record. In this regard, we will emphasize two points.

> First, Burrell was twenty-five years old when he first sought benefits. Qualifying for them under Listing 12.05(C) requires evidence that a claimant's IQ be between sixty and seventy by the age of twenty-two. Although this may be demonstrated either directly or circumstantially, the only IQ score from that time in the record of this case is found in a report from a school psychologist made when Burrell was fourteen, and it puts his verbal IQ at ninety-one, his performance IQ at ninety-three, and his full scale IQ at ninety-two. We acknowledge that a more recent measure is within the regulation's purview, at age twenty-six, Burrell's full scale IQ was put at seventy, but maintain that the record as a whole shows Burrell never satisfied the regulation's standard.
>
> Second, receiving benefits under Listing 12.05 also requires a "deficit in adaptive functioning." The administrative law judge noted that Burrell has remained fairly active, maintains an interest in his household, and enjoys apparent satisfactory relationships with family members. He drives and can lift small weights with both arms. Although we are sympathetic to his disabilities. Burrell is still physically capable of earning a living and contributing to society. The same analysis, coupled with the vocational expert's testimony that over four thousand jobs suitable to Burrell's condition exist solely within his five county area, extends to the administrative law judge's determination that Burrell is not unable to work. We see no need to disturb it either. Substantial evidence supports these findings of the administrative law judge as well. In our review of cases like this, "[t]hat there may be substantial evidence in the record to support another conclusion is irrelevant." *Walters*, 127 F.3d at 532.

238 F.3d at 419.

In the opinion of the undersigned, this case is clearly distinguishable in that there exists a record showing that plaintiff suffered with mental impairment as early as age three. Tr. at 490. Further, it was error for the ALJ to discredit plaintiff's IQ score based upon her use of public transportation, taking care of a pet, socializing, and having an extensive history of part time work. None of these actions discredit her IQ test score. Plaintiff has never been employed in a position that would allow her to support herself, with past work as a bus aide, baby sitter and kitchen helper. As a bus aide, plaintiff helped children get onto the bus. Most of plaintiff's jobs were obtained from family friends, and plaintiff needed consistent supervision and reminders to complete the most simple

8

tasks. Contrary to the ALJ's finding, plaintiff does not have an extensive history of part-time work. Further, the record establishes that plaintiff's mental impairment existed prior to age 22.

At age five, plaintiff had difficulty following directions in school and had an increased activity level. *Id*. At age seven, after two years in the school system, plaintiff entered kindergarten and struggled with learning and following directions. *Id*. Dr. G. Michael Nidiffer, M.D. recommended special education classes with the possibility of additional tutoring as opposed to plaintiff repeating kindergarten. Tr. at 495. Plaintiff was evaluated at age ten by specialists from the Gundersen Lutheran Medical Center Comprehensive Child Care Center in Lacrosse, Wisconsin. Tr. at 497-507. At that time, plaintiff was diagnosed with complex migraine, chronic static encephalopathy, attention deficit hyperactivity disorder, oppositional defiant disorder and learning disabilities. Tr. at 500. Plaintiff continued to have difficulty in the classroom. In February 1995, plaintiff was evaluated by Ivan Pavkovic, M.D., a pediatric neurologist for a seizure disorder. Tr. at 416-419. Plaintiff was having clusters of seizures, sometimes three to five seizures in a day. Tr. at 417. Plaintiff's EEG was consistent with a finding of partial epilepsy. Tr. at 417. The neurologist diagnosed plaintiff with Attention Deficit Disorder and learning disability, migraine headaches, partial epilepsy, and complex partial seizures. Tr. at 418. In September 1997, plaintiff was diagnosed with a history of partial complex seizures and EEG testing showed episodic bilateral epileptiform activity. Tr. at 390.

In the opinion of the undersigned, the record shows that plaintiff suffered from learning disabilities at least from the age of three that were consistent with her IQ test score. It is recommended that the court find that it was error for the ALJ to reject plaintiff's IQ score. Further, in the opinion of the undersigned, the records shows a deficit in adaptive functioning. Plaintiff has a history of medical issues that began as early as age three, and the record establishes that she is

9

unable to perform substantial gainful work activities as an adult. In the opinion of the undersigned, the record does not support the Commissioner's decision denying plaintiff's request for disability benefits. The opinions of the treating physicians and medical evidence establish that plaintiff suffers an impairment that would not permit her to perform substantial gainful work.

Accordingly, it is recommended that the decision of the Commissioner be reversed under sentence four of 42 U.S.C. § 405(g) because substantial evidence does not exist to support the Commissioner's decision that plaintiff is not disabled.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: August 7, 2015 /s/ TIMOTHY P. GREELEY
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE